# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| AMERANTH, INC. | § | |
| | § | |
| v. | § | Case No. 2:10-CV-294-JRG-RSP |
| | § | |
| PAR TECHNOLOGY CORP., et al. | § | |

## CLAIM CONSTRUCTION
## MEMORANDUM AND ORDER

On May 30, 2012, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent Nos. 6,384,850 and 6,871,325. After considering the arguments made by the parties at the hearing and in the parties' claim construction briefing (Dkt. Nos. 155, 157, 158 and 160), the Court issues this Claim Construction Memorandum and Order.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See id.* at 1313. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415

F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

# DISCUSSION

**Claim Term 1: "an information management and synchronous communications system for use with wireless handheld computing devices and the internet"**

| Claim Term | Ameranth's Proposed Construction | PAR's Proposed Construction |
|---|---|---|
| "an information management and synchronous communications system for use with wireless handheld computing devices and the internet" | "a computerized system having multiple devices in which a change to data made on a central server is updated via the internet on wireless handheld computing devices and vice versa" | "a computerized system having a plurality of connected components including a central database, at least one wireless handheld device, at least one Web server, and at least one Web page, each of which stores hospitality applications and data, in which a change made to applications and/or data stored on one of the components is automatically made in real time to applications and/or data stored on all other connected components" |

The parties agree that this language, which is the preamble to claims 12-15 of the '850 patent, and claims 11-13 and 15 of the '325, is a limitation, but do not agree on its proper construction. There are two areas of disagreement. First, PAR contends that changes made to the applications and data must be made in real time. Second, Ameranth contends that elements from the body of the claim should not be imported into the preamble (such as "a central database, at least one wireless handheld device, at least one Web server, and at least one Web page").

A preamble is properly considered a limitation of a claim "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 239 F.3d 801, 808 (Fed. Cir. 2001). Having considered the parties' arguments and the evidence, the Court declines to adopt the parties' agreement that the preamble is limiting and finds that no construction is necessary. Neither party has identified a single aspect of the preamble that is necessary to define the scope of the claims, or is not already captured as a limitation in the body of the claims. The parties' dispute over whether changes

must be made in "real time" merits the Court's consideration but is more properly presented in consideration of the term "synchronized" in the body of the claims.

**Claim Terms 3 and 4: "hospitality applications" and "hospitality applications and data"**

| Claim Term | Ameranth's Proposed Construction | PAR's Proposed Construction |
|---|---|---|
| "hospitality applications" | "one or more application software programs enabled to present information to a user via a user interface regarding reservations, frequency, ticketing, wait lists, food/drink ordering, payment processing or other services provided in the hospitality industry" | "two or more software programs each adapted to perform or assist with hospitality related tasks, e.g., restaurant ordering, reservations, customer ticketing, and wait-list management, etc." |
| "hospitality applications and data" | Other than "hospitality applications," construction not required, but if construed:

"one or more application software programs enabled to present information to a user via a user interface regarding reservations, frequency, ticketing, wait lists, food/drink ordering, payment processing or other services provided in the hospitality industry and associated data" | "two or more software programs each adapted to perform or assist with hospitality related tasks, e.g., restaurant ordering, reservations, customer ticketing, and wait-list management, etc., and the data that is processed, stored, and/or manipulated by these programs" |

The terms "hospitality applications" and "hospitality applications and data" both appear in claim 12 of the '850 patent, which is representative of their usage in the asserted claims:

> 12. An information management and synchronous communications system . . . comprising:
> a. a central database containing *hospitality applications and data*,
> b. at least one wireless handheld computing device on which *hospitality applications and data* are stored,
> c. at least one Web server on which *hospitality applications and data* are stored,
> d. at least one Web page on which *hospitality applications and data* are stored,
> e. an application program interface, and
> f. a communications control module, wherein applications and data are synchronized between the central data base, at least one wireless handheld computing device, at least one Web server and

> at least one Web page; wherein the application program interface
> enables integration of outside applications with the *hospitality
> applications* and wherein the communications control module is an
> interface between the *hospitality applications* and any other
> communications protocol.

Ameranth argues that the term should be construed to explicitly require a user interface. Dkt. No. 155 at 15-19. The Court disagrees. The patentee explicitly claimed aspects of the user interface in some claims (such as claim 1 of the '850 patent), but not in others. Ameranth's arguments stressing the importance and novelty of the user interface disclosed by the specification are not persuasive. If the user interface really was central to Ameranth's invention, Ameranth would have expressly included the user interface in its claims.

Next, Ameranth and PAR each propose listing examples of business tasks in the construction of the term "hospitality applications," but disagree as to what tasks should be listed. Ameranth contends that "payment processing" and "frequency" (e.g., "frequent customer ticketing") should be included in this list, and that PAR improperly limits "ordering" to "restaurant ordering." Dkt. No. 155 at 13-14. PAR responds that it created its task list based upon the specification, and that its list "was not meant to be limiting in scope, but was meant to be appropriate." Dkt. No. 157 at 16.

A review of the intrinsic evidence shows that the tasks listed in the specification are meant to be exemplary, and not an exhaustive listing:

> While computers have dramatically altered many aspects of
> modern life, pen and paper have prevailed in the hospitality
> industry, e.g., for restaurant ordering, reservations and wait-list
> management, because of their simplicity, ease of training and
> operational speed.
> * * *
> The communication module also provides a single point of entry
> for all hospitality applications, e.g., reservations, frequent customer

ticketing, wait lists, etc. to communicate with one another
wirelessly and over the Web.[1]

'850 Pat., 1:19-23 and 4:5-8. The asserted patents use the term "hospitality" to refer to the

hospitality industry, which has a well-known, plain and ordinary meaning. Neither party points

to any evidence that suggests a person having ordinary skill in the art would assign a different

meaning to that term, or that the inventors intended a different meaning. Because it is not

possible to create a complete listing of all the tasks that are properly within the scope of the

claims, the Court will not attempt to list tasks in the construction and will instead refer to these

tasks as "hospitality-related tasks" in its construction. Moreover, the Court notes that "payment

processing" and "frequent customer" are examples of tasks intended to be covered by the term

"hospitality-related tasks."

Finally, the parties dispute whether the term "hospitality applications" requires "*one* or

more application software programs" or "*two* or more software programs." PAR argues that

because the word "applications" is plural, the term must mean that there are "two or more

software programs." Dkt. No. 157 at 15-16. Ameranth argues that in context of the specification

and the claims, the use of the plural "hospitality applications" does not mean that there must be

multiple, separate pieces of software, and that the drafters used the term "hospitality

applications" to refer to types of functions implemented by the software. Dkt. No. 155 at 19-21.

Ameranth notes that PAR's construction would exclude disclosed embodiments where there is a

single application program running on a device. Tr. 48:5-19.

As discussed above, the specification uses the term "hospitality applications" to refer to

common tasks that occur in the hospitality industry. That usage suggests that the term

---

[1] With respect to the quoted text, the Court agrees with Ameranth that the phrase
"frequent customer ticketing" was intended to include a comma as follows: " frequent customer,
ticketing."

"applications," by itself, is not an attempt to define a relationship between software components as residing within a single application program. Rather, when referring to software components and structure, the specification does so expressly. For example, the specification uses the phrases "application software" or "application software components" in that sense.[2] In the context of the claims and specification, the claim term "hospitality applications" uses the word "applications" to reference hospitality-related tasks. The specification reinforces this conclusion with several parallel uses of the word: " . . . and is thus unacceptable for the time criticality of ordering, reservation and wait-list management and other similar applications" ('850 Pat., 1:53-55) and " . . . also provides a single point of entry for all hospitality applications, e.g., reservations, frequent customers [sic] ticketing, wait lists, etc. . . . ." (*id.* at 4:5-7). Therefore, the Court finds that "hospitality applications" means "software adapted to perform or assist with two or more hospitality-related tasks." In light of this construction, the Court finds that no further construction of the term "hospitality applications and data" is necessary.

**Claim Term 5: "web page"**

| Claim Term | Ameranth's Proposed Construction | PAR's Proposed Construction |
|---|---|---|
| "web page" | "a document, with associated files for graphics, scripts, and other resources, accessible over the internet and viewable in a web browser" | "a document accessible via the Internet and viewable by a user with an Internet connection and a browser" |

The substantive difference between the parties' proposed constructions is whether a web page is limited to "a document" alone or also includes "associated files for graphics, scripts, and other resources." The intrinsic evidence does not shed light on the dispute, and both parties rely

---

[2] Examples include: "a well defined application program interface" ('850 Pat., 2:11); a desktop software application" (*id.* at 3:16); "GUIs for software applications" (*id.* at 5:17-18); "interacts with application programs" (*id.* at 5:67-6:1); and "the application programs make use of operating system functions" (*id.* at 6:2-4).

on extrinsic evidence. PAR relies on the 2008 edition of the Oxford Dictionary of Computing, which defines a web page as "a hypertext document on the World Wide Web." Dkt. No. 157 at 18. Ameranth relies on the World Wide Web Consortium's 1999 definition of a web page as "[a] collection of information, consisting of one or more Web resources, intended to be rendered simultaneously, and identified by a single URI." Dkt. No. 155 at 22. The same source provides an example of a web page using the definition: "[a]n image file, an applet, and an HTML file identified and accessed through a single URI, and rendered simultaneously by a Web client." *Id.*

The Court accords greater weight to Ameranth's dictionary evidence because it was published in the same year as the earliest effective filing date of the asserted patents. Moreover, the World Wide Web Consortium is a well-known standards body in the field of Internet technologies. The dictionary PAR relies upon was not published until nearly a decade after the earliest filing date. Moreover, PAR suggests a very narrow construction of the claim term, which is not convincingly supported by the definition they cite – the Oxford definition refers to a "hypertext document," which is not simply "a document," as PAR suggests. Therefore, the Court adopts Ameranth's construction and construes the term "web page" to mean "a document, with associated files for graphics, scripts, and other resources, accessible over the internet and viewable in a web browser."

**Claim Terms 7 and 10: "an application program interface" and "the application program interface enables integration of outside applications with the hospitality applications"**

| Claim Term | Ameranth's Proposed Construction | PAR's Proposed Construction |
|---|---|---|
| "an application program interface" | "a software specification or program configured to enable users and software applications to communicate with each other" | "a set of functions, procedures, standards or conventions by which an application program can gain access to specific operating system or network services" |

PAR argues that the specification does not provide a definition for an application program interface, but instead merely describes its functionality. Dkt. No. 157 at 21. PAR relies on dictionary definitions of application program interfaces, and argues that Ameranth has not identified any intrinsic or extrinsic evidence "to refute the inclusion of [the term] 'operating system'" in its construction. *Id.* at 20.

Ameranth claims that PAR relies on overly generic definitions of an application program interface, and injects unnecessary terms into the construction such as "operating system" and "network services." Tr. 70:21-71:14. Ameranth contends that its proposal better captures the specification's description of an application program interface that operates at the application-level, and not the "operating system or network services" level. Dkt. No. 155 at 24-25. Ameranth argues that the following discussion of the application program interface in the specification supports its position: "[the invention's features include] a well-defined API that enables third parties such as POS companies, affinity program companies and internet content providers to fully integrate with computerized hospitality applications . . . ." '850 Pat., 3:63-67.

The Court agrees that intrinsic evidence refers to application program interfaces that operate at the application-level. Ultimately, PAR does not appear to dispute this point, but instead argues that application-level interfaces are covered by the "network services" portion of its proposed construction. Whether or not "network services" applies as PAR contends, PAR provides no justification for augmenting the construction with the phrase "specific operating system or network services," which is not used by the asserted patents. The Court finds that the term "an application program interface" means "a set of functions and procedures that enables a program to gain access to other software programs."

| Claim Term | Ameranth's Proposed Construction | PAR's Proposed Construction |
|---|---|---|
| "the application program interface enables integration of outside applications with the hospitality applications" | "a server side software specification or program configured to enable applications of third parties such as point of sale ("POS") companies, affinity program companies and internet content providers or other applications to integrate and synchronize with hospitality applications on one or more of the databases, servers, and/or wireless handheld computing devices used in the system" | "the API enables third-party computer programs to fully integrate with the hospitality applications" |

At argument, PAR indicated that it was indifferent to the construction of this term (as well as term 7, "an application program interface"), but offered that Ameranth's proposed construction was needlessly verbose. Tr. 73:5-74:4. Ameranth agreed that the construction of claim term 7 would largely resolve the dispute over claim term 10. Tr. 71:15-22. However, Ameranth believes that its construction of term 10 provides greater clarity because it gives particular examples from the specification of "outside applications." Tr. 72:12-18. Ameranth does not know what the phrase "fully integrate" means in PAR's proposed construction, or why it is necessary. Tr. 72:19-24.

The Court is persuaded that construction is necessary to clarify the meaning of "outside application," which appears in this term (i.e. term 10). The Court finds that Ameranth has not justified importing the exemplars of "outside applications" from the specification into the claim language itself. Accordingly, the Court construes the term "the application program interface enables integration of outside applications with the hospitality applications" to mean "the application program interface enables third-party software programs to integrate with the hospitality applications."

**Claim Terms 8 and 11: "a communications control module" and "an interface between the hospitality applications and any other communications protocol"**

| Claim Term | Ameranth's Proposed Construction | PAR's Proposed Construction |
|---|---|---|
| "a communications control module" | "a software program that is enabled to allow communication of hospitality information between interconnected devices or different applications via one or more application program interfaces and via one or more communications protocols" | "a communications control program that facilitates the transfer of communications to and from hospitality applications stored on each of a central database, at least one wireless handheld device, at least one Web server, and at least one Web page" |
| "an interface between the hospitality applications and any other communications protocol" | Other than "hospitality applications," construction not required, but if construed:<br><br>"a software program that is enabled to allow communication of information regarding reservations, frequency, ticketing, wait lists, food/drink ordering, payment processing or other services provided in the hospitality industry between interconnected devices via one or more application program interfaces and via one or more communications protocols" | "the communications control program facilitates the transfer of communications to and from hospitality applications stored on each of a central database, at least one wireless handheld device, at least one Web server, and at least one Web page" |

PAR does not identify any material differences between the parties' proposed constructions, but believes that its constructions do a better job of defining the functionality of the communications control module, and would be more easily understood by a jury. Tr. 74:6-19. Ameranth argues that there are a number of problems with PAR's construction for term 8. First, PAR allegedly imports other claim elements into these terms without a basis for doing so, such as "a central database, at least one wireless handheld device, at least one Web server, and at least one Web page." Second, PAR's constructions improperly define where communications are stored. Finally, PAR's constructions introduce the phrase "transfer of communications," for

which there is no support. *See* Tr. 74:23-76:8; Dkt. No. 155 at 26-27. Ameranth contends that

no construction of term 11 is necessary. Dkt No. 155 at 26; Tr. 74:20-75:5.

The parties identify three portions of the specification that are relevant to defining the

communications control module:

> The communication module also provides a single point of entry
> for all hospitality applications, e.g., reservations, frequent customer
> ticketing, wait lists, etc. to communicate with one another
> wirelessly and over the Web. This *communication module is a
> layer that sits on top of any communication protocol and acts as an
> interface between hospitality applications and the communication
> protocol* and can be easily updated to work with a new
> communication protocol without modifying the core hospitality
> applications.
>
>         * * *
>
> A communications control program monitors and routes all
> communications to the appropriate devices. It continuously
> monitors the wireless network access point and all other devices
> connected to the network such as pagers, remote devices, internet
> Web links and POS software. Any message received is decoded by
> the software, and then routed to the appropriate device.
>
>         * * *
>
> The synchronous communications control module discussed above
> provides a single point of entry for all hospitality applications to
> communicate with one another wirelessly or over the Web. This
> *communications module is a layer that sits on top of any
> communication protocol and acts as an interface between
> hospitality applications and the communication protocol*. This
> layer can be easily updated to work with a new communication
> protocol without having to modify the core hospitality
> applications.

'850 Pat., 4:5-13, 9:21-27 and 11:24-32 (emphasis added).

In this instance, the Court finds that the specification itself provides the best construction

for the term at issue. "[A] communication control module" means "a software layer that sits on

top of a communication protocol and acts as an interface between hospitality applications and the

communications protocol." Given its inherent clarity, the Court is persuaded that no

construction is necessary for claim term 11 ("an interface between the hospitality applications and any other communications protocol").

**Claim Term 9: "synchronized"**

| Claim Term | Ameranth's Proposed Construction | PAR's Proposed Construction |
|---|---|---|
| "synchronized" | "enabled to cause substantially the same hospitality information to be reflected or maintained consistently for user operation via user interface on client side devices in a client/server system" | "a change made to applications and/or data on one of the connected system components (a central server, a wireless handheld computing device, a web server, or a web page) is automatically made in real time to applications and/or data stored on each of the other connected components" |

The parties primarily dispute whether the term "synchronized" requires that changes be made in "real time." PAR is the primary proponent of requiring "synchronized" to mean "real time," and advances several arguments in support of its position.

First, PAR argues that Ameranth distinguished claims over prior art U.S. Patent No. 5,991,739 ("Cupps") during prosecution by arguing that the claims require real time synchronization. Dkt. No. 157 at 4-5 and 11. In essence, PAR argues that Ameranth disclaimed non-real time synchronization during prosecution. PAR submits that the applicants for the '850 patent amended relevant claims (1, 12 and 31) to include the phrase, "wherein data comprising the modified menu is synchronized between the data storage device and at least one other computing device." PAR further points out that in making the quoted amendment, the applicants argued:

> Cupps does not describe the synchronization of generated menus between different databases or computing devices. As matter of fact Cupps describes data transmission via phone or fax (e.g., col. 10 lines 26-42) precisely because Cupps did not appreciate what Applicants describe and claim, i.e., real-time synchronization of data on different computers or databases. Claims 12 and 31 as

> amended are thus believed to be patentably distinguishable over
> Cupps.

Dkt. No. 157 at 5. PAR concludes from the quoted argument that the applicants equated the claim term "synchronize" with the concept of "real time." Dkt. No. 157 at 11. At the core of this argument lies the applicants' statement that, "[a]s matter of fact Cupps describes data transmission via phone or fax (e.g., col. 10 lines 26-42) precisely because Cupps did not appreciate what Applicants describe and claim, i.e., real-time synchronization of data on different computers or databases." Dkt. No. 157, Ex. 3 at 15.

The Court finds that there was no disclaimer of non-real time synchronization during prosecution. First, PAR's argument rests on a sentence that is merely illustrative in the context of the overall argument. Immediately prior to that sentence, the applications make clear that the distinction between the applicants' then pending claims and the Cupps reference was that "Cupps does not describe the synchronization of generated menus between different databases or computing devices." *Id.* This distinction was sufficient because Cupps did not disclose synchronization. The Cupps reference discloses an online ordering system where the client devices interact directly with dynamically generated web pages. Thus, there is no suggestion or disclosure that applications or data must be synchronized between the devices and the server, whether real time or not, because the data was maintained on the server.

Second, the statements made during prosecution that are quoted by PAR do not refer to claims that are sufficiently similar to the claims under consideration here. For example, those claims (1, 12 and 31 of the application) relate to menus and not to the "hospitality applications" that are the subject of the claims being construed. Even if the applicants' argument equated "synchronization" with "real time" in those then-pending claims, this Court cannot clearly attribute the same connection to the words in the asserted claims at issue here.

Finally, PAR's reliance on the quoted phrase ("what Applicants describe and claim, i.e., real-time synchronization") relies on an overly narrow reading of the word "and." In other words, PAR reads the phrase to add the word "both": "what Applicants [both] describe and claim, i.e., real-time synchronization." There is no dispute that the '850 patent's specification describes "real time" synchronization and that the disputed claims call for synchronizing. Thus, even if PAR's contention were without other error, there would be serious ambiguity in deriving the meaning PAR suggests. Based on this record, the Court is not persuaded that Ameranth clearly and unambiguously disavowed non-real time synchronization.

In addition, both parties argue that the specification supports their respective positions. PAR identifies the portion of the specification that it says supports finding that synchronization must be real time. Dkt. No. 157 at 23-24. Ameranth contends that the specification only requires that synchronization result in consistency between the data on the server and the clients. Dkt. No. 155 at 8-10. The following portions of the specification are referenced by the parties in their arguments:

> Such features would include fast and automatic synchronization between a central database and multiple handheld devices, synchronization and communication between a World Wide Web ("Web") server and multiple handheld devices, a well-defined application program interface ("API") that enables third parties such as point of sale ("POS") companies, affinity program companies and internet content providers to fully integrate with computerized hospitality applications, real-time communication over the internet with direct connections or regular modem dialup connections and support for batch processing that can be done periodically throughout the day to keep multiple sites in synch with the central database.
>
> * * *
>
> A single point of entry works to keep all wireless handheld devices and linked web sites in synch with the backoffice server applications so that the different components are in equilibrium at any given time and an overall consistency is achieved. For example, a reservation made online can be automatically

communicated to the backoffice server and then synchronized with all the wireless handheld devices wirelessly. Similarly, changes made on any of the wireless handheld devices are reflected instantaneously on the backoffice server Web pages and the other handheld devices.

'850 Pat., 2:7-19 and 4:14-23. PAR also relies on dictionary definitions for the word "synchronize" and "synchronous" to support its contention that synchronization must be real time. Dkt. No. 157 at 25.

After considering the evidence, the Court finds that the term "synchronized" means "made to be the same." While it is true that the specification describes synchronization as being "fast and automatic" or even "instantaneous[]" in places, it also describes using periodic batch processing to synchronize data. Therefore, the specification does not support requiring synchronization to occur in "real time." However, both the specification and the ordinary meaning do suggest that the meaning of synchronization is to ensure that data on the devices is made to be the same.

**Claim Term 12: "a single point of entry"**

| Claim Term | Ameranth's Proposed Construction | PAR's Proposed Construction |
|---|---|---|
| "a single point of entry" | "software which enables communication between the server and client sides of a client/server system, and between hospitality applications, such that an overall consistency is achieved with respect to information present in interconnected devices and applications" | "a single communications protocol that allows for all hospitality applications to communicate with one another wirelessly or over the internet" |

"[A] single point of entry" appears in only one of the asserted claims:

13. The [system] of claim 12 wherein the communications control module provides a single point of entry for all hospitality applications and wherein the single point of entry allows the synchronization of at least one wireless handheld computing device and at least one Web page with the central database so that

at least one handheld device, at least one Web page and central database are consistent.

'850 Pat., claim 13.  Ameranth suggests that the term describes a functional limitation of the communications control module, and yet Ameranth offers a construction that recites structure. Tr. 91:25-92:12.  Similarly, PAR's construction deems the single point of entry to be a communications protocol, and suggests that the specification supports its position:

> The synchronous communications control module discussed above provides a single point of entry for all hospitality applications to communicate with one another wirelessly or over the Web. This communications module is a layer that sits on top of any communication protocol and acts as an interface between hospitality applications and the communication protocol. This layer can be easily updated to work with a new communication protocol without having to modify the core hospitality applications. The single point of entry works to keep all wireless handheld devices and linked Web sites in synch with the backoffice server (central database) so that the different components are in equilibrium at any given time and an overall consistency is achieved.

'850 Pat., 11:24-36.

The Court agrees with Ameranth that the term "a single point of entry" describes functionality of the communications control module.  However, the Court is not satisfied by either party's construction and instead finds that the term "a single point of entry" simply means "a center of communication."  With respect to Ameranth's proposed construction, the Court finds it is unnecessary to recite the various structures that communicate using the communications control module because those structures are identified by the rest of the disputed claim.  The portion of Ameranth's construction discussing consistency is also unnecessary because the Court separately construed what it means for data to be synchronized. PAR's construction is rejected because there is not adequate evidence that a single communications protocol is necessary to implement "a single point of entry."  PAR admits that

the protocol aspect of its proposed construction is not supported by the intrinsic evidence. *See* Tr. 90:19-22.

**Claim Terms 13 and 14: "information entered on at least one Web page and transmitted over the internet is automatically communicated to the central database and at least one wireless handheld computing device" and "information entered on at least one wireless handheld computing device is automatically communicated to the central database and at least one Web page"**

| Claim Term | Ameranth's Proposed Construction | PAR's Proposed Construction |
|---|---|---|
| "information entered on at least one Web page and transmitted over the internet is automatically communicated to the central database and at least one wireless handheld computing device" | "Other than "Web page," construction not required, but if construed:<br><br>"information entered on at least one document, with associated files for graphics, scripts, and other resources, accessible over the internet and viewable in a web browser is transmitted in real time to one or more databases associated with the server side of a client/server system and at least one wireless computing device that is sized to be held in one's hand" | "information entered on a web page and transmitted over the internet is automatically communicated in real time to the central database and at least one wireless handheld computing device" |
| "information entered on at least one wireless handheld computing device is automatically communicated to the central database and at least one Web page" | Other than "Web page," construction not required, but if construed:<br><br>"information entered on at least one wireless computing device that is sized to be held in one's hand is transmitted in real time to one or more databases associated with the server side of a client/server system and at least one document, with associated files for graphics, scripts, and other resources, accessible over the internet and viewable in a web browser" | "information entered on a wireless handheld computing device is automatically communicated in real time to the central database and at least one web page" |

PAR argues that these terms should be construed to require that the automatic communications occur in "real time." Dkt. No. 157 at 27-28. PAR contends that the specification supports this position:

> For example, a reservation made online can be automatically communicated to the backoffice server and then synchronized with all the wireless handheld devices wirelessly. Similarly, changes made on any of the wireless handheld devices are reflected instantaneously on the backoffice server Web pages and the other handheld devices.

'850 Pat., 4:18-23.

The Court finds that it is not necessary for automatic communications to be made in real time. In construing the term "synchronized," it was already explained that the specification does not require that any communications or changes be made in real time even though real time communications or changes are described in some portions of the specification. For example, the specification discloses using periodic batch processing to synchronize data among devices. Such a process is an example of an automatic communication that is not made in real time. The Court finds that no construction is necessary for claims 13 and 14.

**Claim Term 15: "the data is sent to a wireless paging device"**

| Claim Term | Ameranth's Proposed Construction | PAR's Proposed Construction |
|---|---|---|
| "the data is sent to a wireless paging device" | "updating the status of reservation, frequency, ticketing, wait lists, food/drink ordering, payment processing or other hospitality information on a device that is capable of two way wireless communication" | "synchronized data is wirelessly sent to a pager" |

Ameranth argues that the Court should adopt its construction because it is taken directly from the specification. Dkt. No. 155 at 32-33. PAR objects to Ameranth's construction because it changes the scope of the claim from covering one-way wireless communication to covering two-way wireless communication. Dkt. No. 157 at 28-29. The parties cite the following passages from the specification that are relevant to this term:

> This invention relates to an information management and synchronous communications system and method for generation of

computerized menus for restaurants and other applications . . . for use in remote data entry, information management and synchronous communication between host computer, digital input device or remote pager via standard hardwired connection, the internet, a wireless link, smart phone or the like.

\* \* \*

Adding a wireless link allows paging of beeper equipped customers directly from the operator interface on the wireless handheld devices and communication to and from various input/output transmitters and receivers to update the status of the order, reservation or other information and thus further reduce the workload on the operator and enable operations to proceed much faster. This link could also be hardwired or otherwise implemented using any two-way messaging transport.

'850 Pat., 1:6-16 and 11:59-67.

After reviewing the evidence and the parties' arguments, the Court finds that no construction is necessary for this term. Neither party has articulated a reason for why the plain and ordinary meaning of the term should not apply. PAR's proposed construction merely seeks to make explicit that "data" is "synchronized data." The word "data" refers to the data described elsewhere in the claim, and the requirement for the data to be synchronized is best left to the rest of the claim.

With respect to Ameranth's construction, the Court disagrees that it is supported by the specification. The cited portion of the specification explains that there are two uses for a wireless link – not two uses for a wireless pager. The first use of a wireless link is to allow "paging of beeper equipped customers directly from the operator interface on the wireless handheld devices." Paging suggests one-way wireless communication, and is clearly covered by the plain and ordinary meaning of the claim term. The second use of a wireless link is to allow "communication to and from various input/output transmitters and receivers to update the status of the order, reservation or other information and thus further reduce the workload on the operator and enable operations to proceed much faster." This second use does suggest using

two-way wireless communication, but does not suggest using two-way wireless communication with a beeper or a "wireless paging device." Therefore, the specification does not support changing the scope of the claim term from covering sending data to a wireless paging device to also covering two-way wireless communication.

## CONCLUSION

The Court adopts the above constructions. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 10th day of August, 2012.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE